UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

BRENDA MITZE,

        Plaintiff,

v.                                                      Case No. 13-C-444

CAROLYN COLVIN,

        Defendant.

**DECISION AND ORDER**

Plaintiff Brenda Mitze brings this action challenging the decision of the Commissioner of Social Security denying her disability benefits. For the reasons given below, the decision of the Commissioner will be affirmed.

**I. Background**

Plaintiff's medical problems originally stemmed from a cyst in the pineal gland in her brain. These problems included vertigo, dizziness, blurred vision and chronic headaches. The cyst was discovered with a CT scan after she fell down the stairs in October 2009. She began physical therapy on December 1, 2009 to improve her balance issues, but was unable to tolerate the therapy due to headaches and pain. She applied for disability benefits the next day.

Soon after, Plaintiff consulted with a neurosurgeon in Madison, who in May 2010 performed surgery to remove the cyst. The surgery was considered successful in resolving Plaintiff's dizziness and blurred vision. However, she soon began experiencing postoperative pain and numbness in the

back of her head, which caused her to begin consulting with a number of pain specialists. At various times she was prescribed Vicodin, Topamax, lidocaine, oxycodone, fentanyl, gabapentin and morphine to treat her pain and recurring headaches. She also tried acupuncture. She completed several sessions of physical therapy for her neck pain and stiffness but had only minimal improvement.

In 2011 Plaintiff went on a lengthy trip to Australia, partly to visit a friend and partly to seek treatment. She also began seeing a new chiropractor and, after consulting another physician, underwent an MRI of her cervical spine. The MRI uncovered degenerations and a possible nerve impingement. At her November 2011 hearing, she testified that it felt like "like someone took a baseball bat has been whacking me up side the head. [sic] It goes down into my neck and down through the spine across my shoulders." (Tr. 44.) She said she did not read or watch television often because of troubles with her eyes. Her medication helps somewhat but has side effects, including fatigue. She is able to drive a car, but keeps herself close to home and uses side streets when possible.

The ALJ denied benefits. As discussed in further depth below, the ALJ essentially concluded that the Plaintiff's solo lengthy trip to Australia and her daily running and marathon preparation undercut her testimony that her pain was disabling. In addition, the ALJ rejected the opinions of Plaintiff's chiropractors and found the decision of her physician not controlling.

## II. Analysis

The Commissioner's final decision will be reversed only if it is not supported by substantial evidence or is based on a legal error. *Nelms v. Astrue,* 553 F.3d 1093, 1097 (7th Cir. 2009).

Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). "Substantial evidence must be more than a scintilla but may be less than a preponderance." *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007). "An ALJ's findings are supported by substantial evidence if the ALJ identifies supporting evidence in the record and builds a logical bridge from that evidence to the conclusion." *Giles ex rel. Giles v. Astrue,* 483 F.3d 483, 486 (7th Cir. 2007). A reviewing court may not "displace the ALJ's judgment by reconsidering facts or evidence or making credibility determinations." *Skinner*, 478 F.3d at 841. But if the decision "lacks evidentiary support or is so poorly articulated as to prevent meaningful review," a remand is required. *Steele v. Barnhart,* 290 F.3d 936, 940 (7th Cir. 2002).

**A. Failure to Properly Consider Medical Sources**

    **1. Opinion of Alexandra Kellogg, D.C.**

Plaintiff first argues that the ALJ failed to adequately account for Dr. Kellogg's opinion. Plaintiff saw Dr. Kellogg, a chiropractor, in the fall of 2011, apparently in connection with her treatment at an associated pain institute. Dr. Kellogg filled out a questionnaire indicating that Plaintiff would need an unscheduled 5-10 minute break every hour and would likely miss work 3-4 times per months. (Tr. 542.) The ALJ did not remark on the questionnaire. Instead, the ALJ noted Dr. Kellogg's observation that there was a psychological component to Plaintiff's condition, which was consistent with one of her physician's opinions that anxiety worsened her symptoms. (Tr. 23.) Apart from that comment, Plaintiff argues that the ALJ did not explain what weight, if any, he was giving the chiropractor's opinion.

3

For purposes of social security disability determinations, a chiropractor is not an "acceptable medical source," cannot offer "medical opinions," and is not considered a "treating physician." *Pierce v. Colvin,* 739 F.3d 1046, 1051 (7th Cir. 2014). "An ALJ may consider a chiropractor's opinions, of course, but the weight they will be given will depend on a number of factors, including the degree to which they are supported by objective evidence." *Id.* Thus, an ALJ "may" consider such opinions, and in doing so the ALJ must explain the weight given to the opinion. It is clear from the ALJ's opinion here that the weight given to the more extreme limitations Dr. Kellogg noted in the questionnaire was zero. The ALJ explained why she did not credit Dr. Kellogg's opinions by referencing Dr. Kellogg's comments in the record. The ALJ noted the chiropractor's remarks that Plaintiff had only been in treatment for a matter of weeks, which was not long enough to experience any benefit. In addition, Dr. Kellogg had noted that "all of the medical records . . . show good progress without complication after surgery, so there is some discrepancy between the records and what she is telling me." (Tr. 537.) Dr. Kellogg's treatment notes also indicate that Plaintiff failed—unusually—to contact either the chiropractic or pain clinic office following an MRI, and that Plaintiff had not been in treatment long enough to make a difference. "It is difficult to grade her ability to work on this limited amount of history and treatment time." (Tr. 539.)

The ALJ spent two paragraphs addressing Dr. Kellogg's opinion.[1] By Dr. Kellogg's own admission, her opinion is worth very little on its face because, as she remarked, it was "difficult" to grade Plaintiff's ability to work. In addition, Dr. Kellogg noted the psychological component,

---

[1] Plaintiff evidently believes the ALJ simply ignored any discussion of Kellogg's opinion. That is not true. The ALJ addressed Dr. Kellogg's opinion in two separate paragraphs at p. 23 of the transcript. Plaintiff ignores the first of these paragraphs.

4

which she could not address. The ALJ cited this evidence, and it is clear that the ALJ gave the questionnaire no weight. That is all that is required.

Plaintiff's argument that the Commissioner somehow violated the *Chenery* doctrine in defending the ALJ's decision ignores the specific reasons provided by the ALJ for rejecting the more severe limitations set out in the questionnaire. Her argument also reflects a misreading of the very case the doctrine is named for, *SEC v. Chenery Corp.*, 332 U.S. 194 (1947). *Chenery* holds that an administrative agency may not ask a reviewing court to uphold its action on a ground different from that on which the agency acted. 318 U.S. at 87–88, 92–93. In other words, the Commissioner may not argue on judicial review that a decision denying benefits on the ground that the claimant is not disabled should be affirmed because the claimant is no longer insured. *Chenery* does not hold, however, that the Commissioner may not cite additional evidence in the record that supports the findings the ALJ actually made to support his decision. The primary duty of the court on judicial review of a decision by the Commissioner is to determine whether there is "substantial evidence" in the record to support the findings on which the decision is based. See 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ."). There is no requirement that the ALJ cite every item of evidence that supports each finding in his or her written decision.

### 2. Opinion of Warren Witkowski, D.C.

Plaintiff had also received chiropractic treatment from Dr. Witkowski. Dr. Witkowski filled out a questionnaire and indicated that Plaintiff would need 15-minute breaks every half-hour. (Tr. 574.) He also opined that Plaintiff would need to miss four or more days per month. The ALJ rejected these opinions on the ground that the limitations were "extreme" and not consistent either

5

with the rest of the record or even with Dr. Witkowski's own treatment notes. (Tr. 23.) The ALJ also noted that Dr. Witkowski's notes often remarked on Plaintiff's "dramatic presentation," which the ALJ apparently viewed as evidence of symptom exaggeration. (Tr. 23, 551, 552.)

Plaintiff argues that the ALJ should have given more consideration to Dr. Witkowski's opinions, given that Witkowski (unlike Kellogg) had treated the Plaintiff for a number of years. Notably, however, the Plaintiff does not explain what evidence in the record actually supported the draconian restrictions Witkowski (or Kellogg) imposed. In essence Dr. Witkowski's questionnaire would mean the Plaintiff could work only two-thirds of every hour (30 minutes out of every 45), and there is nothing else in the record that would support such a restriction. Plaintiff was training for marathons, which take hours to complete—presumably without any breaks. The ALJ provided ample reasoning for discounting the chiropractor's opinion.

### 3. Opinion of Paul Hoell, M.D.

Plaintiff also argues the ALJ erred in failing to give controlling weight to Dr. Hoell, one of Plaintiff's many physicians.

> The undersigned also give little weight to statement by Dr. Hoell at Exhibit 17F [Tr. 501], as it appears he relied quite heavily on the subjective report of symptoms and limitations provided by the claimant, and seemed to uncritically accept as true most, if not all, of what the claimant reported. Yet, as explained elsewhere in this decision, the objective evidence provides good reasons for questioning the reliability of the claimant's subjective complaints. Dr. Hoell does not mention that the claimant failed to follow through with potentially ameliorative treatment as reported in the treatment notes (Exhibit 13F at 2).

(Tr. 23.)

In general, more weight is given to the opinion of treating physicians because of their greater familiarity with the claimant's conditions and circumstances. *Clifford v. Apfel,* 227 F.3d 863, 870

(7th Cir. 2000). Of course on the other side we must acknowledge that treating physicians often have a relationship with a patient and therefore might be less than fully objective.

Normally the argument is that the ALJ failed to give controlling weight to the opinion of a plaintiff's treating physician, but here the argument is unusual because the Plaintiff does not actually cite an opinion that Dr. Hoell offered. The record consists of treatment notes with Dr. Hoell, some of which are actually unsupportive of disability. (E.g., Tr. 370 (noting "modest" pain in neck, training for the 5K race, and Plaintiff's "jovial" mood.) Dr. Hoell did write a very brief "to whom it may concern" letter, noting that Plaintiff experienced "persistent, chronic, severe neck pain" following surgery. (Tr. 501.) But if that is the "opinion" at issue here, that is not really in dispute. The dispute is how limiting those symptoms are.

In discounting the opinion, the ALJ noted that Dr. Hoell's opinion (such as it was) was heavily based on the claimant's own subjective reports of pain and other symptoms. As discussed below, the ALJ was within his discretion to discount Plaintiff's subjective complaints, given the various factors the ALJ cited. In a situation like this, the ALJ's credibility determination "collapses" into the decision regarding the treating physician:

> where a treating physician's opinion is based on the claimant's subjective complaints, the ALJ may discount it. The question of which physician's report to credit thus collapses into the credibility issue; because the ALJ found that Bates was not credible in her reports of pain, she also gave Dr. Cordero's opinion, which relied heavily on these reports, little weight. Because we find that the ALJ's credibility determination with respect to pain was not patently wrong, her assessment of Dr. Cordero's opinion is also not in error.

*Bates v. Colvin,* 736 F.3d 1093, 1100 (7th Cir. 2013).

Accordingly, the question of whether the ALJ erred in discounting Dr. Hoell's opinion turns on whether the ALJ made a proper determination of the Plaintiff's credibility.

7

**B. Credibility Determination**

Plaintiff argues that the ALJ's credibility determination was flawed. An ALJ's credibility determination is entitled to deference, and will be overturned only if it is "patently wrong." *Pepper v. Colvin,* 712 F.3d 351, 367 (7th Cir. 2013). Courts are not allowed to reweigh the facts or reconsider the evidence. *Elder v. Astrue,* 529 F.3d 408, 413 (7th Cir.2008). But when a credibility finding rests on "objective factors or fundamental implausibilities," rather than on a claimant's demeanor or other subjective factors, courts have greater leeway to evaluate the ALJ's determination. *Schomas v. Colvin,* 732 F.3d 702, 708 (7th Cir. 2013).

Here, the ALJ stated:

> In general, the claimant's treating physician noted very few objective signs in relation to the claimant's complaints. For example, despite claims of dizziness and instability, her gait and station were normal. While the claimant has reported severe pain and an MRI in November 2011 showed bilateral cervical facet arthropathy with suspected impingement of the right C3 nerve root, her activities do not support that the claimant is more functionally limited than found herein. The claimant was able to travel to Australia alone for an extended trip.
> The claimant did not mention any problems to her physicians regarding sitting during the very long flight. The claimant reported running an hour a day, training for a marathon and participating in a 5K race. Her treating physician noted that the claimant appeared "put out" by having to wait for a CT scan and the physician took this as a sign that the claimant's pain could not be too severe. These facts strongly suggest that the claimant's pain is not so severe or frequent so as to prevent sedentary work.
> The claimant's chiropractor noted discrepancies between the claimant's medical records and what she reported to him. The chiropractor noted that the claimant did not persist in treatment long enough to be expected to receive any benefit. There are other examples of the claimant failing to follow through with potentially ameliorative treatment, which damages her credibility. In May 2011, the claimant declined an occipital nerve injection, declined to travel to Madison for tertiary care, and opted not to see Dr. Sehgal for pain management.

(Tr. 22-23) (citations omitted.)

Plaintiff first argues that the ALJ misinterpreted Plaintiff's disability claim by relying on pre-operation records to discount her credibility. For example, in April 2010 (one month prior to brain surgery) Plaintiff's physician noted that Plaintiff was "put out" at having to wait for a CT scan because she wanted to spend the time at a family event. (Tr. 252.) The doctor took that as "a sign that her pain cannot be too severe." (*Id.*) The ALJ cited this as evidence undercutting Plaintiff's credibility.

Although that particular record pre-dates her surgery (Plaintiff's symptoms changed following surgery), it is still pertinent evidence about the plaintiff's credibility. Many or most of her symptoms are subjective—pain, dizziness, vertigo, etc.—and there was significant doubt among her medical providers whether the pineal cyst was even the source of the problem. (Tr. 252.) Thus, there was little in the way of objective evidence of her symptoms, and as such the ALJ was entitled to note that her own treating physician thought she might be exaggerating them. In addition, the same physician noted that "a large part of her symptomatology is worsened by the overlay of generalized anxiety . . ." (*Id.*) Although these factors speak to her *pre*-surgery condition, they nevertheless are suggestive of a patient whose own doctor concluded that her symptoms might not have been as grave as she was reporting. The ALJ was certainly entitled to take note of that fact, because that fact may shed light on the symptoms she reported *after* her surgery as well. *Falsus in uno, falsus in omnibus*.

The ALJ also seemed particularly moved by the fact that the Plaintiff had traveled alone to Australia for an extended period of time and had been running on a regular basis. The Plaintiff argues that this unfairly focuses on a few issues and ignores her own testimony about her

9

limitations, specifically her testimony that she cannot play with her four children, drives a car only close to home and relies on her children for cooking and cleaning.

Plaintiff testified, for example, that she cannot visit her daughter in college three hours away because "it hurts to drive that far." (Tr. 49.) But, as the ALJ noted, she was able to withstand a very lengthy trip to Australia (roughly 24-hours each way) on an airplane. We do not know the details of that trip—e.g., whether she needed to stand up and down during the flight, for example—but there is no indication that it caused her undue hardship. As the ALJ noted, she discussed the trip with her counselor but never mentioned anything about the flights there and back being intolerable. Simply put, it is highly unusual for someone to be unable to drive in a car for three hours (with the ability to make stops, if necessary) but be able to withstand two transpacific flights lasting roughly a day each. This does not even account for the other rigors of international travel, such as parking, baggage, security and ticketing lines, changing planes, changing terminals, international customs, trams, taxis, shuttles, and the like. And if Plaintiff was traveling from her home in New London, Wisconsin—far from any truly international airport—that would add additional complications to the trip.

In addition, the fact is that Plaintiff was in Australia nearly two months. People who have limited physical abilities do not generally book lengthy, open-ended trips with little discernible support structure. Plaintiff apparently had a friend in Australia, but apart from that there is no indication she had any idea what to expect when she got there. If her limitations were truly so severe, one would expect evidence of a traveling companion or some other support system to help her in her day-to-day life in a foreign country. At the very least it was not unreasonable for the ALJ

10

to find the trip to Australia a significant factor in getting to the heart of the Plaintiff's symtomatology.

Similarly, the ALJ cited the Plaintiff's running, including her involvement in a 5K race. Plaintiff stated that running helped with her stress and said the pain wasn't any worse or better while running. (Tr. 316.) She argues now that the ALJ did not develop the record to determine whether she actually *ran* the 5K race or just walked it. The record indicates a "5K run" (Tr. 370). In addition, in April 2011 the record indicates she had been "training for a marathon that she is planning on running." (Tr. 392.) During the same period of time Plaintiff was seeing Dr. Witkowski, who stated that she was running one hour per day and had a "dramatic presentation," which the ALJ also noted. (Tr. 552.) The record thus contains ample evidence that the Plaintiff had been running for extended lengths.

As with the Australia trip, the ALJ was entitled to find Plaintiff less than fully credible because she was testifying that she could not even play with her kids, drive three hours or do some household chores—limitations strongly suggestive of complete disability—but then during the same time period she was running daily and traveling abroad. ALJs are entitled to some degree of deference when making credibility determinations, and here there was ample reason to question the severity of Plaintiff's symptoms given the conflict with her own reported activities. Added to these discrepancies is the fact that Plaintiff's chiropractor found a similar disconnect between her symptoms and the objective findings (Tr. 537), and also found it unusual that Plaintiff failed to follow through with treatment. (Tr. 539.) Another doctor discerned "a sign that her pain cannot be too severe." (Tr. 252.)

The Plaintiff tries to undermine these conclusions by citing the limited daily activities she testified to. But such an argument is circular. If the ALJ has concluded (for other reasons) that the Plaintiff's credibility is impaired, her own testimony cannot somehow be used to undermine that conclusion. The point of the ALJ's conclusion about credibility is that Plaintiff's testimony was *not* fully believable, and thus the substance of her testimony plays no role in evaluating the weight to be given to that testimony.

In sum, there were several legitimate indications in the record that Plaintiff's activities were at odds with her testimony.[2] The ALJ built the requisite "logical bridge" demonstrating that her credibility was compromised due to the discrepancy between her activities and her reported symptoms. Whether Plaintiff was actually exaggerating her symptoms or not, the ALJ was not "patently wrong" to conclude that Plaintiff's credibility was suspect. *Pepper v. Colvin,* 712 F.3d at 367. Accordingly, there is no error with respect to either the credibility determination or the ALJ's treatment of Dr. Hoell.

**C. Step Two**

Finally, Plaintiff argues the ALJ erred by failing to find her mental impairments to be "severe" at Step Two of the sequential analysis. "An impairment or combination of impairments is considered 'severe' if it significantly limits an individual's physical or mental abilities to do basic work activities." SSR 96-3p. The ALJ concluded that "The claimant's medically determinable mental impairment of adjustment disorder does not cause more than minimal limitation in the claimant's ability to perform basic mental work activities and is therefore nonsevere." (Tr. 21.)

---

[2] In addition, during her testimony Plaintiff indicated she had brain surgery "so I wouldn't die." (Tr. 44.) But there was no indication in the record that her benign pineal cyst was life-threatening.

12

Plaintiff argues that there is evidence in the record that she was experiencing feelings of hopelessness, suicidal thoughts, and had been seeing a counselor since August 2010. Although that is true, there is no evidence that she was ever diagnosed with a specific mental illness or that she sought treatment (or medication) from a psychologist or psychiatrist. Merely visiting a counselor is not evidence of mental illness. In addition, in her own testimony she was asked about mental illness and depression and minimized those aspects of her life. The ALJ asked how her limitations affected her emotionally, and her response was simply to recite those limitations: "I can't do anything anymore. I can't play with my kids outside in the winter. . . . I can't go drive to college to see my daughter three hours away . . ." (Tr. 48-49.) Then, when asked whether she medicated for depression, she simply said "no," without elaboration. When asked by her attorney, she explained that her counselor (who is not a physician or psychologist) "thinks" she should take some medication, but she declined to do so given the number of other medications she was on. (Tr. 52.)

In sum, at best the record shows the Plaintiff, like millions of people, struggled at times with anxiety and other issues. But there is no evidence that those issues rose to the level of "severe," and the ALJ did not err in so concluding.

### III. Conclusion

For the reasons given above, the decision of the Commissioner is **AFFIRMED**.

Dated this 21st day of May, 2014.

    s/ William C. Griesbach
William C. Griesbach, Chief Judge
United States District Court

13